UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JIMMY J. BIBBS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CAUSE NO.  1:11-cv-246-DKL-TWP |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration , | ) | |
| | ) | |
| Defendant. | ) | |

### ENTRY

Plaintiff Jimmy J. Bibbs ("Mr. Bibbs") requests judicial review of the decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("SSA"), denying Plaintiff's application for supplemental social income ("SSI") disability benefits. For the reasons set forth below, the Commissioner's decision is **REVERSED** and **REMANDED**.

## I.  BACKGROUND

### A.    Procedural History

Mr. Bibbs applied for SSI disability benefits through the SSA on December 14, 2007. [Doc. 14-5 at 3-5.]  The claim was initially denied on January 9, 2008, and reconsideration was subsequently denied on March 17, 2008.  [Doc. 14-4 at 6-9; Doc. 14-3 at 3; Doc. 14-4 at

11-13.][1] Mr. Bibbs next requested an administrative hearing, which took place on February 26, 2010, before Administrative Law Judge ("ALJ") Susan Maley.  [Doc. 14-2 at 22.]  The ALJ denied Mr. Bibbs's claim, and the SSA Appeals Council affirmed the ALJ's order. [Doc. 14-2 at 2, 17.]  Mr. Bibbs then filed the instant action to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).  [Doc. 1 at 1.]  The parties consented to jurisdiction by this Magistrate Judge.  [Doc. 12; Doc. 22.]

## B.  Personal History

Plaintiff was born on January 25, 1976.  [Doc. 14-6 at 2.]  Mr. Bibbs has been afflicted by sickle cell anemia,[2] and he claimed that condition first interfered with his ability to work

---

[1] The Administrative Law Judge's ("ALJ") Decision states that Mr. Bibbs filed his claim on November 28, 2007, and the claim was initially denied on January 7, 2008. [Doc. 14-2 at 11.]  The Court will follow whatever dates are set forth in the record.

[2] The medical record in this case uses the terms "sickle cell anemia" and "sickle cell disease" interchangeably.  Sickle cell disease is "[a]n autosomal recessive inherited disorder in which the individual has one hemoglobin S gene and either a second hemoglobin S gene or another abnormal hemoglobin gene."  5-S, J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine*, (Matthew Bender), at S-147.  "If there are two hemoglobin S genes, the result is sickle cell anemia."  5-S, J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine*, (Matthew Bender), at S-147.  Sickle cell anemia, also called sickle cell disease, is "characterized by the presence of sickle-shaped or crescent-shaped red blood cells."  5-S, J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine*, (Matthew Bender), at S-146.  Sickle cell crisis is "[a]n acute painful episode" that "can last for several hours."  5-S, J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine*, (Matthew Bender), at S-147.  "Three forms occur: (1) hemolytic crisis, caused by destruction of red blood cells; (2) aplastic crisis, caused by temporary cessation of red blood cell production; and (3) splenic sequestration crisis, when red blood cells become trapped in the spleen." "  5-S, J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine*, (Matthew Bender), at S-147.  "Full sickle cell anemia, where both of the paired genes have the sickle cell trait, is marked by recurrent episodes of pain (pain crises) caused by occlusion of the small blood vessels by the sickle-shaped blood cells."  9 Attorneys Medical Advisor § 110:21.

on December 12, 2004.  [Doc. 14-6 at 7.]  Mr. Bibbs has not worked since July 15, 2003.  [Doc.

14-6 at 7.]  Mr. Bibbs is married to Desiree Lolla-Bibbs.  [Doc. 14-2 at 58-59.]

C.      **Medical History**

A great deal of medical records were submitted in this case, all of which

demonstrate emergency room visits, hospital admissions, office visits with healthcare

providers, and examinations of x-rays from February 2006 to January 2010 for Mr. Bibbs.

1.      **Medical History Before SSA Evaluation**

In late February 2006, Mr. Bibbs was admitted to Methodist Hospital for one week

after complaining of fever, cough, sore throat, myalgia, diaphoresis, chills, nausea,

vomiting, and diarrhea.  [Doc. 14-9 at 26.]  On March 14, 2006, Mr. Bibbs had a follow-up

visit at Methodist Adult Ambulatory Care Clinic, where it was noted that his previous flu-

like symptoms resolved.  [Doc. 14-9 at 27.]  He also provided a short overview of his

medical history.  [Doc. 14-9 at 26-27.]  Mr. Bibbs reported that he was afflicted with sickle

cell anemia, and that he experienced three sickle cell crises per year.  [Doc. 14-9 at 26-27.]

He noted reconstructive surgery on his right knee and left calf in 1992 after sustaining

multiple gunshot wounds.  [Doc. 14-9 at 26.]  Mr. Bibbs underwent a splenectomy, ventral

hernia repair, and cholecystectomy in September 2005.  [Doc. 14-9 at 26.]  He indicated that

he took Vicodin for back and knee pain.  [Doc. 14-9 at 26.]

The record demonstrates that medical staff at Methodist Adult Ambulatory Care Clinic reviewed Mr. Bibbs's x-rays on seven occasions from May 23, 2006, to November 28, 2006.  [Doc. 14-9 at 41-44.]  The record is silent as to whether Mr. Bibbs submitted for medical treatment on these occasions.   Generally, these x-rays did not provide any noteworthy information with the exception of Mr. Bibbs's chest x-ray from May 23, 2006, which revealed bony stigmata of sickle cell disease.  [Doc. 14-9 at 41.]

On March 21, 2007, Mr. Bibbs reported to the emergency room at Methodist Hospital, where he was diagnosed with sickle cell crisis, as well as fever, pain, and viral gastroenteritis.  [Doc. 14-7 at 12; Doc. 14-9 at 57.] Mr. Bibbs was treated with intravenous fluids and narcotics to control the pain resulting from the sickle cell crisis.  [Doc. 14-7 at 12; Doc. 14-9 at 57.]  Mr. Bibbs was subsequently admitted to  Methodist Adult Ambulatory Care Clinic from March 21, 2007 to March 23, 2007.  [Doc. 14-7 at 12; Doc. 14-9 at 57.] Medical staff took x-rays of Mr. Bibbs's chest and knee, which revealed no significant findings other than mild medial compartment degenerative disease in his knee.  [Doc. 14-9 at 44-45.]

On March 27, 2007, Mr. Bibbs went to Methodist Adult Ambulatory Care Clinic for a follow up visit, where he reported that his sickle cell anemia was becoming worse over the past year.  [Doc. 14-7 at 14; Doc. 14-9 at 28.]  He complained of a sickle cell crisis every other week.  [Doc. 14-7 at 14; Doc. 14-9 at 28.]  Medical staff subsequently reviewed Mr. Bibbs's chest x-ray, which revealed end plate changes of thoracic vertebral bodies consistent with his history of sickle cell anemia.  [Doc. 14-7 at 15; Doc. 14-9 at 45-46.]

On May 29, 2007, Mr. Bibbs went to Methodist Adult Ambulatory Care Clinic for an office visit, where he complained of lower back pain.  [Doc. 14-7 at 15; Doc. 14-9 at 29.] It was noted that this pain was not similar to Mr. Bibbs's sickle cell pain.  [Doc. 14-7 at 15; Doc. 14-9 at 29.]  It was also noted that Mr. Bibbs did not want to see a hematologist regarding sickle cell anemia at this time.  [Doc. 14-7 at 16; Doc. 14-9 at 30.]  Medical staff subsequently reviewed Mr. Bibbs's chest x-rays on five occasions, finding no acute cardiopulmonary abnormality, but noted findings consistent with sickle cell anemia.  [Doc. 14-7 at 9-10, 16-17; Doc. 14-9 at 46-48.]

On August 3, 2007, Mr. Bibbs called Methodist Adult Ambulatory Care Clinic to refill his pain medications.  [Doc. 14-7 at 10; Doc. 14-9 at 30.]  The medical staff facilitated the refill of his Vicodin.  [Doc. 14-7 at 10; Doc. 14-9 at 31.]

On August 28, 2007, Mr. Bibbs  went to Methodist Adult Ambulatory Care Clinic for an office visit, where he requested a refill of his medications.  [Doc. 14-7 at 8; Doc. 14-9 at 31.]  A treating physician referred Mr. Bibbs to a hematologist to determine if another medication, Hydroxyurea, will aid in managing his sickle cell disease.  [Doc. 14-7 at 8; Doc. 14-9 at 32.]

On September 9, 2007, Mr. Bibbs was admitted to the hospital for 23 hours after complaining of sickle cell pain.  [Doc. 14-7 at 5-8; Doc. 14-9 at 32-33.]  The medical staff provided intravenous treatment to hydrate and control the pain.  [Doc. 14-7 at 5-8; Doc. 14-9 at 32-33.]

Methodist Hospital medical staff subsequently reviewed two of Mr. Bibbs's chest x-rays and one x-ray of Mr. Bibbs's right shoulder.  [Doc. 14-7 at 3-4; Doc. 14-9 at 48-50.] The chest x-rays revealed no acute findings, but the should x-ray revealed sickle cell stigmata.  [Doc. 14-7 at 5-8; Doc. 14-9 at 32-33.]

On December 14, 2007, Mr. Bibbs reported for the hematology consultation.  [Doc. 14-7 at 2; Doc. 14-9 at 34.]  It was noted that Mr. Bibbs has had frequent hospitalizations for pain crises, and "[h]e was seen in the Methodist Hospital Emergency Room approximately three to four times per month."  [Doc. 14-7 at 2; Doc. 14-9 at 34.]  The treating physician prescribed Hydroxyurea.  [Doc. 14-7 at 3; Doc. 14-9 at 35.]

With respect to the December 14, 2007 hematology consultation, it is unclear if Mr. Bibbs reported the number of hospitalizations to the treating physician or if the treating physical referred to hospital notes.  At this point, the medical records from Methodist Hospital and Methodist Adult Ambulatory Care Clinic provided that Mr. Bibbs went to the emergency room one time, and was admitted to the hospital on three occasions from February 2006 through December 2007.  However, Mr. Bibbs's hospital visits increased dramatically from January to July 2008.

### 2.    The First SSA Evaluation

On January 7, 2008, Mr. Bibbs submitted for an examination with the SSA examining physician, who concluded that Mr. Bibbs's sickle cell anemia was not severe.  [Doc. 14-7 at 46.]  The physician noted that a review of the evidence demonstrated a diagnosis of sickle cell anemia with normal hematocrits.  [Doc. 14-7 at 46.]  The physician found no evidence

of frequent severe crisis, even though Mr. Bibbs was hospitalized for "a mild sickle cell flare up." [Doc. 14-7 at 46.] The physician noted that Mr. Bibbs claimed four emergency room visits per month due to sickle cell crises. [Doc. 14-7 at 46.] The physician found Mr. Bibbs to be partially credible; however, the physician reported that "[t]here is some doubt as to whether these represent actual acute crisis and it is suggested that much of his pain may be musculoskeletal in nature and unrelated to sickle cell disease." [Doc. 14-7 at 46.]

### 3.   Medical Treatment Following the First SSA Evaluation

On January 14, 2008, Mr. Bibbs reported to the emergency room, complaining of lower back and joint pain. [Doc. 14-9 at 10.] The treating physician's clinical impression was vaso-occlusive crisis and back pain. [Doc. 14-9 at 11.] Vaso-occlusive manifestations or the blockage of blood vessels are among the principal events in sickle cell disease. 5-S, J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine*, (Matthew Bender), at S-147. The medical staff provided Mr. Bibbs with intravenous treatment, and he was subsequently discharged. [Doc. 14-9 at 14-15.]

On January 16, 2008, Mr. Bibbs returned to the emergency room, complaining coughing, chills, vomiting, mucous, weakness, and aches. [Doc. 14-9 at 2.] An x-ray of Mr. Bibbs's chest revealed low lung volumes with basilar airspace disease versus atelectasis. [Doc. 14-9 at 50.] Medical staff provided intravenous treatment. [Doc. 14-9 at 6.] Mr. Bibbs was diagnosed with pneumonia, and prescribed medication. [Doc. 14-9 at 37.] Mr. Bibbs was discharged, and instructed to follow up with his primary care provider. [Doc. 14-9 at 7.]

On January 23, 2008, Mr. Bibbs again reported to the emergency room at Methodist Hospital, complaining of fever, chills, lower back pain, and joint pain.  [Doc. 14-8 at 75-78.]  Medical staff provided intravenous treatment, and Mr. Bibbs was subsequently admitted to Methodist Adult Ambulatory Care Clinic.  [Doc. 14-8 at 79, 81.] Mr. Bibbs's x-rays revealed issues related to pneumonia, as well as chronic bony changes compatible with sickle cell anemia.  [Doc. 14-9 at 50-51.]  Mr. Bibbs was diagnosed with left lower lobe pneumonia, sickle cell anemia, and generalized pain. [Doc. 14-9 at 37, 59.]  Mr. Bibbs was discharged on January 25, 2008, and instructed to follow up with his primary care provider. [Doc. 14-9 at 60.]

On February 5, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, complaining of typical sickle cell pain.  [Doc. 14-8 at 66.]  Medical staff provided intravenous treatment for Mr. Bibbs.  [Doc. 14-8 at 71.] Mr. Bibbs was discharged, and instructed to follow up with his hematologist.  [Doc. 14-8 at 72.]

On February 10, 2008, Mr. Bibbs reported to the emergency room at Methodist Hospital, complaining of pain in his knees, elbows, and pelvis, as well as blurred vision. [Doc. 14-8 at 56.]  Medical staff diagnosed Mr. Bibbs with acute sickle cell crisis, and provided intravenous treatment.  [Doc. 14-8 at 57, 60.]  Mr. Bibbs's chest x-rays revealed no acute abnormality.  [Doc. 14-9 at 51.]  Mr. Bibbs was discharged, and instructed to follow up with a physician at Methodist Adult Ambulatory Care Clinic.  [Doc. 14-9 at 61.]

The following day, February 11, 2008, Mr. Bibbs returned to the emergency room at Methodist Hospital, presenting with fever, chills, vomiting, body aches, and cough.

[Doc. 14-8 at 51.] Mr. Bibbs was diagnosed with sickle cell disease, fever, and pneumonia. [Doc. 14-8 at 52.] After receiving treatment in the emergency room, Mr. Bibbs was admitted to Methodist Adult Ambulatory Care Clinic. [Doc. 14-8 at 52, 55.] Upon admission to the hospital, medical staff diagnosed Mr. Bibbs with pneumonia and sickle cell crisis. [Doc. 14-9 at 60-61.] Mr. Bibbs's x-rays revealed reduced lung capacity, and stigmata of sickle cell anemia. [Doc. 14-9 at 52.] Mr. Bibbs was discharged on February 18, 2008, and instructed to follow up with his primary care provider and to keep his appointment with the hematologist. [Doc. 60-61.]

On February 29, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, complaining of sickle cell crisis. [Doc. 14-8 at 34.] Medical staff provided intravenous treatment, and Mr. Bibbs was discharged. [Doc. 14-8 at 38-39.]

On March 7, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, complaining of sickle cell pain all over. [Doc. 14-8 at 27.] Medical staff provided intravenous treatment. [Doc. 14-8 at 29.] Mr. Bibbs was discharged, and instructed to follow up with his primary care provider. [Doc. 14-8 at 30.]

On March 11, 2008, Mr. Bibbs went to Methodist Adult Ambulatory Care Clinic for a follow up visit with his primary care provider. [Doc. 14-9 at 39; Doc. 14-14 at 2.] Mr. Bibbs reported that he had been hospitalized for pneumonia and painful sickle cell crisis. [Doc. 14-9 at 39; Doc. 14-14 at 2.] Mr. Bibbs noted that the new medication, Hydroxyurea, had been effective until his recent bout with pneumonia. [Doc. 14-9 at 39; Doc. 14-14 at 2.] However, Mr. Bibbs stated that his insurance would not cover that medication, and he

could not afford it.  [Doc. 14-9 at 39-40; Doc. 14-14 at 2.]  Medical staff subsequently reviewed Mr. Bibbs's chest x-rays: no acute cardiopulmonary issues and vertebral changes consistent with sickle cell anemia.  [Doc. 14-9 at 53.]

### 4.    The Second SSA Evaluation

On March 17, 2008, Mr. Bibbs submitted for another examination with the SSA examining physician, who affirmed the previous SSA examining physician's January 7, 2008 conclusion that Mr. Bibbs's sickle cell anemia was not severe.  [Doc. 14-9 at 23.]  The physician did not provide any additional specific information.

### 5.    Medical Treatment Through the End of 2008

On March 21, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, complaining of joint pain.  [Doc. 14-11 at 2.]  Medical staff noted sickle cell crisis as the clinical impression. [Doc. 14-11 at 3.] Medical staff provided intravenous treatment.  [Doc. 14-11 at 7.]  Upon discharge, Mr. Bibbs was instructed to return to the emergency room if his condition continued and to follow up with his primary care provider.  [Doc. 14-11 at 8.]

On March 24, 2008, Mr. Bibbs reported to the emergency room at Methodist Hospital, complaining of sharp abdominal pain, as well as joint pain.  [Doc. 14-11 at 10.] Medical staff noted constipation and abdominal pain as the clinical impression.  [Doc. 14-11 at 11.] Medical staff provided intravenous treatment.  [Doc. 14-11 at 15.]  Upon discharge, Mr. Bibbs was instructed to return to the emergency room if his condition continued and to follow up with his primary care provider.  [Doc. 14-11 at 16.]

On March 30, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, reporting lower back and joint pain, and that he was experiencing sickle cell crisis. [Doc. 14-11 at 19.] Medical staff noted sickle cell crisis as the clinical impression. [Doc. 14-11 at 20.] Medical staff provided intravenous treatment. [Doc. 14-11 at 24.] Upon discharge, Mr. Bibbs was instructed to return to the emergency room if his condition continued and to follow up with his primary care provider. [Doc. 14-11 at 25.]

On April 4, 2008, Mr. Bibbs reported to the emergency room at Methodist Hospital, complaining of joint pain. [Doc. 14-11 at 28.] Medical staff noted sickle cell crisis as the clinical impression. [Doc. 14-11 at 29.] Medical staff provided intravenous treatment. [Doc. 14-11 at 33.] Mr. Bibbs was discharged and provided an informational packet regarding follow up instructions. [Doc. 14-11 at 34-35.] The medical staff also reviewed Mr. Bibbs's chest x-rays, finding no acute cardiopulmonary issues, and sickle cell skeletal stigmata. [Doc. 14-9 at 53.]

On April 6, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, reporting of joint pain and sickle cell crisis. [Doc. 14-11 at 37.] Medical staff noted sickle cell crisis as the clinical impression. [Doc. 14-11 at 38.] Medical staff provided intravenous treatment. [Doc. 14-11 at 42.] Upon discharge, Mr. Bibbs was instructed to return to the emergency room if his condition continued and to follow up with his primary care provider. [Doc. 14-11 at 43.] The medical staff also reviewed Mr. Bibbs's knee x-rays, finding mild medial compartment degenerative changes, but no acute abnormality. [Doc. 14-9 at 54.]

On April 10, 2008, Mr. Bibbs reported to the emergency room at Community Hospital, complaining of sore throat and inability to speak, as well as sickle cell crisis. [Doc. 14-10 at 2-3.] Medical staff provided intravenous treatment. [Doc. 14-10 at 3.] Upon discharge, Mr. Bibbs was instructed to return to the emergency room if his condition continued and to follow up with his primary care provider. [Doc. 14-10 at 3.]

On April 12, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, stating that he had been coughing for two days and had been experiencing generalized lower back and joint pain. [Doc. 14-11 at 46.] Medical staff noted sickle cell crisis as the clinical impression. [Doc. 14-11 at 47.] Medical staff provided intravenous treatment. [Doc. 14-11 at 51.] Upon discharge, Mr. Bibbs was instructed to follow up with his primary care provider. [Doc. 14-11 at 52.] The medical staff also reviewed Mr. Bibbs's chest x-rays, which revealed no acute findings. [Doc. 14-9 at 54-55.]

On April 18, 2008, Mr. Bibbs reported to the emergency room at Methodist Hospital after falling from a step ladder. [Doc. 14-11 at 58.] Mr. Bibbs complained of back pain that radiated into his arms and legs. [Doc. 14-11 at 58.] Medical staff noted back pain from the slip and fall accident, as well as sickle cell disease as the clinical impression. [Doc. 14-11 at 59.] Medical staff provided Mr. Bibbs with medication, and directed him to follow up with his primary care provider upon discharge. [Doc. 14-11 at 63-64.] Medical staff also reviewed x-rays of Mr. Bibbs's back, noting no significant change as a result of the slip and fall. [Doc. 14-9 at 55.]

12

On April 20, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, reporting sickle cell crisis with back and joint pain. [Doc. 14-11 at 69, 71.]  Medical staff noted "back pain" and "pain crisis" as the clinical impression.  [Doc. 14-11 at 70.]  Medical staff provided intravenous treatment.  [Doc. 14-11 at 74.]  Upon discharge, Mr. Bibbs was instructed to return to the emergency room if he experienced any further problems, and otherwise referred to his primary care provider.  [Doc. 14-11 at 75.]

On April 23, 2008, Mr. Bibbs reported to the emergency room at Community Hospital, complaining of sickle cell pain.  [Doc. 14-10 at 6.]  Medical staff provided intravenous treatment.  [Doc. 14-10 at 7.]  Upon discharge, Mr. Bibbs was instructed to follow up with his primary care provider.  [Doc. 14-10 at 7.]

On April 29, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, reporting sickle cell crisis with lower back and joint pain.  [Doc. 14-11 at 79.]  Medical staff noted "pain crisis" and sickle cell disease as the clinical impression.  [Doc. 14-11 at 80.]  Medical staff provided intravenous treatment.  [Doc. 14-11 at 84.]  Upon discharge, Mr. Bibbs was instructed to return to the emergency room if he experienced any further problems, and otherwise referred to his primary care provider.  [Doc. 14-11 at 85.]  Medical staff also reviewed Mr. Bibbs's x-rays, noting that "[t]here are stable, chronic, central compression deformities of the lumbar spine, compatible with chronic changes of sickle cell anemia, end plate necrosis."  [Doc. 14-12 at 10.]

On May 6, 2008, Mr. Bibbs reported to the emergency room at Methodist Hospital, complaining of back and joint pain.  [Doc. 14-12 at 2.]  Medical staff provided intravenous

13

treatment.  [Doc. 14-12 at 5.]  Upon discharge, Mr. Bibbs was instructed to return to the emergency room if his condition worsened, and otherwise directed to follow up with his primary care provider.  [Doc. 14-12 at 6.]

On May 16, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, reporting lower back and joint pain.  [Doc. 14-12 at 11.]  Medical staff noted sickle cell disease as the clinical impression.  [Doc. 14-12 at 12.]  Medical staff provided intravenous treatment.  [Doc. 14-12 at 16.]  Upon discharge, Mr. Bibbs was provided with "patient education information" regarding sickle cell disease.  [Doc. 14-12 at 17.]

On May 20, 2008, Mr. Bibbs reported to the emergency room at Methodist Hospital, complaining of headache, neck pain, and joint pain.  [Doc. 14-12 at 19.]  Medical staff noted headache and general pain as the clinical impression.  [Doc. 14-12 at 20.]  Medical staff provided intravenous treatment.  [Doc. 14-12 at 24.]  Upon discharge, Mr. Bibbs was instructed to return to the emergency room if his condition worsened, and otherwise directed to follow up with his primary care provider.  [Doc. 14-12 at 25.] Medical staff also reviewed Mr. Bibbs's chest x-rays, noting certain findings compatible with sickle cell disease.  [Doc. 14-12 at 30.]

On May 23, 2008, Mr. Bibbs went to the emergency room at Community Hospital, complaining of sickle cell crisis.  [Doc. 14-10 at 10.]  Medical staff provided intravenous treatment.  [Doc. 14-10 at 11.]  Upon discharge, Mr. Bibbs was instructed to follow up with his primary care provider.  [Doc. 14-10 at 11.]

14

On May 31, 2008, Mr. Bibbs reported to the emergency room at Methodist Hospital, complaining of sickle cell pain with back and joint pain.  [Doc. 14-12 at 31.]  Medical staff provided intravenous treatment.  [Doc. 14-12 at 36.]  Upon discharge, Mr. Bibbs was provided with "patient education information" regarding sickle cell disease.  [Doc. 14-12 at 37.]  Medical staff also reviewed Mr. Bibbs's chest x-rays, noting certain findings compatible with sickle cell disease.  [Doc. 14-12 at 30.]

On June 9, 2008, Mr. Bibbs went to the emergency room at Methodist Hospital, reporting sickle cell pain in his joints, as well as sharp, stabbing pain in his temple.  [Doc. 14-12 at 39.]  The medical staff noted migraine and sickle cell pain crisis as the clinical impression.  [Doc. 14-12 at 40.] Medical staff provided intravenous treatment.  [Doc. 14-12 at 44.]  Mr. Bibbs was subsequently admitted to the Methodist Adult Ambulatory Care Clinic with a diagnosis of "intractable headache."  [Doc. 14-12 at 48; Doc. 14-14 at 11-12.] During the hospitalization, Mr. Bibbs underwent a computerized axial tomography ("CT scan"), and a fluoroscopic guided lumbar puncture.  [Doc. 14-12 at 73-76.]  There were no remarkable or unusual findings reported with respect to either procedure.  [Doc. 14-12 at 73-76.]  Upon discharge, Mr. Bibbs was provided with "patient education information" regarding sickle cell disease, and instructed to follow up with his primary care provider. [Doc. 14-12 at 72.]

On June 12, 2008, Mr. Bibbs reported to the emergency room at Community Hospital, complaining of increased headache, as well as nausea and vomiting.  [Doc. 14-10 at 14.] Medical staff provided intravenous treatment.  [Doc. 14-10 at 15.] Medical staff also

performed CT scan, magnetic resonance imaging ("MRI"), and lumbar puncture on Mr. Bibbs, and these tests were either noted as normal or unremarkable. [Doc. 14-10 at 17, 19, 22-23.] Mr. Bibbs was discharged in "good condition," and advised to follow up with his primary care provider. [Doc. 14-10 at 25.]

On July 1, 2008, Mr. Bibbs went to Methodist Adult Ambulatory Care Clinic for an office visit, where he complained of "left ear muffling." [Doc. 14-14 at 5.] With respect to Mr. Bibbs's sickle cell anemia, the treating physician noted that Mr. Bibbs's pain medications were refilled. [Doc. 14-14 at 5.]

The record reflects that Mr. Bibbs went to the emergency room 25 times and was admitted to the hospital on three occasions from January to July 2008. The record is silent as to whether Mr. Bibbs had any further hospital visits for the remainder of 2008.

### 6.    Medical Treatment During Incarceration

Next, the record contains various medical records from the Department of Corrections ("DOC") from February to December 2009. These medical records generally chronicle Mr. Bibbs's intake upon incarceration and various chart updates. Notably, Mr. Bibbs was not characterized as disabled for DOC purposes upon intake. [Doc. 14-10 at 52, 62.] There appear to be 11 specific occasions, where Mr. Bibbs met with some sort of healthcare provider during this period.

On February 7, 2009, Mr. Bibbs reported to the DOC chronic care clinic for hypertension. [Doc. 14-10 at 73.] The treating physician's notes reflected nothing unusual. [Doc. 14-10 at 73-74.]

On March 17, 2009, a DOC nurse visited Mr. Bibbs to administer the second stage of a tuberculosis test.  [Doc. 14-10 at 76.]  The nurse's notes reflected nothing unusual. [Doc. 14-10 at 76.]

On April 3, 2009, Mr. Bibbs met a healthcare provider, to whom Mr. Bibbs complained of knee pain and swelling.  [Doc. 14-10 at 80.]  No course of treatment was indicated. The healthcare provider's notes reflected nothing unusual.  [Doc. 14-10 at 77-80.]

On April 30, 2009, Mr. Bibbs met a healthcare provider regarding a wound on Mr. Bibbs's lower back.  [Doc. 14-10 at 85.] The healthcare provider noted that Mr. Bibbs had a spider bite on his left buttocks.  [Doc. 14-10 at 88.]  No course of treatment was noted; however, the healthcare provider noted that Mr. Bibbs's condition was improving with respect to the spider bite. [Doc. 14-10 at 89.]

On May 27, 2009, Mr. Bibbs had a chronic care visit, where he reported that his last sickle cell crisis took place in February.  [Doc. 14-10 at 93.]  Mr. Bibbs complained that he had not received his Hydroxyurea.  [Doc. 14-10 at 93.]  The healthcare provider's notes reflected nothing unusual.  [Doc. 14-10 at 93-94.]

On June 1, 2009, at approximately 3:30 p.m., Mr. Bibbs complained of sickle cell crisis.  [Doc. 14-10 at 96.] After being treated with various medications, Mr. Bibbs indicated that he felt better by 1:30 p.m. on the following day.  [Doc. 14-10 at 96.]

On July 28, 2009, Mr. Bibbs met a DOC nurse for a scheduled visit.  [Doc. 14-10 at 102.] Mr. Bibbs complained of pain in his joints for the past three to four days.  [Doc. 14-10 at 102.] The nurse observed "no acute distress."  [Doc. 14-10 at 102.]

On July 30, 2009, Mr. Bibbs met a DOC healthcare provider for a scheduled visit, where he claimed that sickle cell anemia was causing problems. [Doc. 14-10 at 104.] The healthcare provider recorded "no apparent distress." [Doc. 14-10 at 104.]

On August 11, 2009, Mr. Bibbs met a DOC healthcare provider for a scheduled visit. [Doc. 14-10 at 108.] The healthcare provider did not record any specifics about the nature of this visit.

On August 20, 2009, Mr. Bibbs complained that his sickle cell anemia was "acting up." [Doc. 14-10 at 109.] Apparently, Mr. Bibbs had to be excused from "kitchen duties" due to sickle cell pain. [Doc. 14-10 at 113.] The DOC nurse noted that Mr. Bibbs had increased pain in his "back, knees, wrists, and various other places." [Doc. 14-10 at 109.] Nothing else was specified by the DOC nurse.

On December 7, 2009, Mr. Bibbs reported for a chronic care visit, where Mr. Bibbs and the healthcare provider addressed Mr. Bibbs's sickle cell disease and hypertension, most likely in anticipation of Mr. Bibbs's release from the DOC on or around December 10, 2009. [Doc. 14-10 at 120, 122.]

**7.     Medical Treatment Following Incarceration**

In the month following Mr. Bibbs's incarceration, he visited the emergency room five times and was admitted to the hospital twice.

On December 11, 2009, Mr. Bibbs reported to the emergency room at Methodist Hospital, complaining of sickle cell crisis with back and joint pain. [Doc. 14-12 at 77.] Medical staff noted "sickle cell pain crisis" as the clinical impression. [Doc. 14-12 at 78.]

Medical staff provided intravenous treatment.   [Doc. 14-12 at 82.]   Mr. Bibbs was discharged and advised to follow up with his primary care provider.  [Doc. 14-12 at 84-85.]

On December 19, 2009, Mr. Bibbs went to the emergency room at Methodist Hospital, reporting abdominal pain, as well as joint pain.  [Doc. 14-13 at 5.]  Medical staff provided intravenous treatment.   [Doc. 14-13 at 4.]   Upon discharge, Mr. Bibbs was instructed to return to the emergency room if his condition became worse, or otherwise to follow up with his primary care provider.  [Doc. 14-13 at 8.]  Medical staff also reviewed CT scans of Mr. Bibbs's abdomen and pelvis, which were noteworthy only to the extent that there were findings compatible with a history of sickle cell disease.  [Doc. 14-13 at 10.]

On December 24, 2009, Mr. Bibbs reported to the emergency room at Methodist Hospital, complaining of coughing and vomiting.  [Doc. 14-13 at 12.]  Medical staff noted vomiting and "sickle cell crisis pain" as the clinical impression.  [Doc. 14-13 at 11.]   Mr. Bibbs received intravenous treatment.  [Doc. 14-13 at 15.]  Upon discharge, Mr. Bibbs was instructed to return to the emergency room if his condition became worse, or otherwise to follow up with his primary care provider.  [Doc. 14-13 at 16.]

On December 30, 2009, Mr. Bibbs went to the emergency room at Methodist Hospital, reporting nausea, vomiting, and sickle cell crisis.  [Doc. 14-13 at 27, 32.]  Medical staff provided intravenous treatment.   [Doc. 14-13 at 35.]   Mr. Bibbs was admitted to Methodist Adult Ambulatory Care Clinic due to the his sickle cell crisis.  [Doc. 14-13 at 37; Doc. 14-14 at 6-7.]  Throughout the hospitalization, Mr. Bibbs remained on intravenous medication due to pain and nausea.   [Doc. 14-13 at 50.]   Mr. Bibbs was ultimately

discharged on January 4, 2010. [Doc. 14-13 at 27.] Upon discharge, Mr. Bibbs was instructed to follow up with his primary care provider on the following day, and to obtain a referral to a hematologist. [Doc. 14-13 at 28.]

On January 5, 2010, Mr. Bibbs reported to Methodist Adult Ambulatory Care Clinic for an office visit, where Mr. Bibbs complained of body aches and joint pain, as well as nausea, vomiting, and chest pain. [Doc. 14-14 at 16.] The treating physician noted that Mr. Bibbs would be placed "on his old regime of folic acid, and hydroxyurea." [Doc. 14-14 at 18.] The treating physician also referred Mr. Bibbs to a hematologist. [Doc. 14-14 at 18.]

On January 8, 2010, Mr. Bibbs went to the emergency room at Methodist Hospital, reporting abdominal pain, as well as nausea and vomiting. [Doc. 14-13 at 60.] Medical staff noted sickle cell crisis. [Doc. 14-13 at 59.] Medical staff provided intravenous treatment. [Doc. 14-13 at 62.] Mr. Bibbs was subsequently admitted to Methodist Adult Ambulatory Care Clinic, where medical staff sought to alleviate Mr. Bibbs's sickle cell crisis and ameliorate his nausea and vomiting. [Doc. 14-14 at 9-11.] During the hospitalization, Mr. Bibbs underwent x-rays, cardiac rhythm surveillance, and an ultrasound, none of which revealed any abnormalities. [Doc. 14-13 at 65, 68-70, 72, 74-78.] Mr. Bibbs also reported for a hematology consultation, and the hematologist recommended further hydration with respect to the present hospitalization. [Doc. 14-14 at 14-15.] Mr. Bibbs was discharged on January 20, 2010. [Doc. 14-14 at 21.]

**D.  The Administrative Hearing**

The administrative hearing took place on February 26, 2010.  [Doc. 14-2 at 22.]  Mr.
Bibbs, Mr. Bibbs's wife Ms. Lolla-Bibbs, and vocational expert Lisa Courtney testified at the
hearing. [Doc. 14-2 at 23.]

**1.       Mr. Bibbs's Testimony**

At the hearing, Mr. Bibbs testified about his medical condition, indicating that his
main impairment was sickle cell anemia, and that he suffered two to four sickle cell crises
per month.  [Doc. 14-2 26-28, 50.][3]  During a sickle cell crisis, Mr. Bibbs claimed that he
experienced pain in all of his joints, chest pain, and lower back pain.  [Doc. 14-2 at 28.]  Mr.
Bibbs explained that a sickle cell crisis would shut down his body entirely, and that he
needed assistance to do any daily activities, like dressing, walking, or using the bathroom.
[Doc. 14-2 at 28, 50.]   Mr. Bibbs takes Vicodin and Dilaudid as needed for pain
management.  [Doc. 14-2 at 28, 36.]  If the pain medications do not alleviate his pain, Mr.
Bibbs will go to the emergency, as directed by his healthcare providers in such cases.  [Doc.
14-2 at 29, 48.] Mr. Bibbs claimed that he could miss as much as two weeks of work during
a severe sickle cell crisis or three or fours days of week during a mild sickle cell crisis.
[Doc. 14-2 at 36, 49.] Mr. Bibbs stated that he may not go to the emergency room for a mild
sickle cell crisis, but a severe sickle cell crisis could place him in the hospital.  [Doc. 14-2 at
48-50.]

_____

[3] The ALJ noted that one of Mr. Bibbs's treating physicians indicated that Mr.
Bibbs suffered from anxiety and depression; however, Mr. Bibbs testified at the hearing
that he did not feel depressed.  [Doc. 14-2 at 30.]

Mr. Bibbs also reported that he had knee replacement surgery in 1992.  [Doc. 14-2 at 29.]  He claimed that his knee still bothered him, and that he had to wear a brace.  [Doc. 14-2 at 29.]  During the hearing, Mr. Bibbs's counsel represented that Mr. Bibbs also had his spleen and gallbladder removed.  [Doc. 14-2 at 67.]  Mr. Bibbs explained that his spleen was removed because it was enlarged and caused poor circulation.  [Doc. 14-2 at 67-68.]  Mr. Bibbs claimed that the splenectomy was performed due to his sickle cell anemia.  [Doc. 14-2 at 67-68.]  He also claimed that he was more susceptible to conditions like pneumonia or influenza because he no longer has a spleen.  [Doc. 14-2 at 68.]

Mr. Bibbs next testified that sickle cell anemia prevented him from maintaining gainful employment.  Mr. Bibbs indicated that he worked as a cashier, bagger, and stocker at a grocery store from 1998 to 2000, but he lost that job because he was sick too many days.  [Doc. 14-2 at 34.]  Mr. Bibbs also testified that he worked at various times as a cook, pizza box assembler, car washer, and cleaner.  [Doc. 14-2 at 33-34.]  Mr. Bibbs's last job was as a part-time cook at Purnell's Barbecue in 2007.  [Doc. 14-2 at 34-35.]  Mr. Bibbs claimed that his sickle cell anemia prevented him from keeping that job.  [Doc. 34-35.]  Mr. Bibbs indicated that he missed time at work because of sickle cell crises.  [Doc. 14-2 36.]  Mr. Bibbs also claimed that his employer did not want him working around the hot grill when Mr. Bibbs used Vicodin or Dilaudid.  [Doc. 14-2 at 35, 37-38.]

The ALJ questioned Mr. Bibbs about his incarceration from February to December 2009.  [Doc. 14-2 at 30.] While incarcerated, Mr. Bibbs worked in the kitchen from February until August or September 2009.  [Doc. 14-2 at 44-45.]  Mr. Bibbs indicated that he

22

distributed trays, and worked from 2:30 to 6:00 p.m., three days on and then four days off. [Doc. 14-2 at 44.]   Mr. Bibbs claimed that he no longer worked in the kitchen after experiencing a sickle cell crisis.   [Doc. 14-2 at 44-45.]   Mr. Bibbs also claimed that it was difficult to see DOC medical staff as needed.   [Doc. 14-2 at 45.]

During Mr. Bibbs's testimony, the ALJ sought a definitive recent evaluation of Mr. Bibbs's sickle cell anemia.   [Doc. 14-2 at 38.]   Mr. Bibbs's counsel cited the medical records from Mr. Bibbs's two most recent hospitalizations on December 30, 2009 (a five-day hospitalization), and January 8, 2010 (a 12-day hospitalization).   [Doc. 38.] Specifically, the ALJ requested a hematology report.   [Doc. 14-2 at 40.][4]   At this point, Mr. Bibbs indicated that he had an appointment with the hematologist on the previous day; although he later claimed that the medical staff would not permit his to take part in the appointment because Mr. Bibbs could not afford to pay for it.   [Doc. 14-2 at 42, 46.]

**Ms. Lolla-Bibbs's Testimony**

Next, Ms. Lolla-Bibbs testified at the hearing.   Mr. Bibbs and Ms. Lolla-Bibbs were married on February 14, 2008, after dating for approximately two years.   [Doc. 14-2 at 58-59.] She works part-time at a daycare, and is the couple's sole source of income.   [Doc. 14-2 at 58.]   According to Ms. Lolla-Bibbs, Mr. Bibbs has had sickle cell anemia since their

---

[4] Mr. Bibbs's counsel indicated that he would provide additional medical records to the ALJ.  These records appear to be Exhibit 9F, which were not admitted during the course of the hearing.  The ALJ admitted Exhibits 1A through 8F at the hearing. Exhibits 9F appear to be more general medical records regarding Mr. Bibbs's recent hospitalizations on December 30, 2009, and January 8, 2010.  A report by a hematologist was included as part of Mr. Bibbs's 12-day hospitalization beginning on January 8, 2010.

relationship began and Mr. Bibbs told her that he has had that condition since birth. [Doc. 14-2 at 55.] She claimed that Mr. Bibbs had three or four sickle cell crises each month; however, weather changes seemed to make his condition worse. [Doc. 14-2 at 53.] Ms. Lolla-Bibbs asserted that Mr. Bibbs cannot move during a sickle cell crisis, and that she has to help him with everything, such as getting dressed, using the bathroom, or walking. [Doc. 14-2 at 53, 56.] She indicated that Mr. Bibbs takes his pain medications when sickle cell crisis begins. [Doc. 14-2 at 53-54.] If Mr. Bibbs's pain does not subside, Ms. Lolla-Bibbs takes him to the emergency room, where medical staff usually provides intravenous treatment. [Doc. 14-2 at 53-54.]

### 3.    Vocational Expert's Testimony

Finally, Ms. Courtney, the vocational expert, testified at the hearing. Ms. Courtney has been a certified disability management specialist since 1992. [Doc. 14-4 at 51.] Ms. Courtney focused on Mr. Bibbs's cashier/bagger/stocker position at the grocery store. [Doc. 14-2 at 64. She noted that he earned approximately $4,500 in 2000. [Doc. 14-2 at 64.] She also reviewed the exertion level and classification for cashier, bagger, and stocker: cashier is light and semiskilled; bagger is medium and unskilled; stocker is heavy and unskilled. [Doc. 14-2 64.] Ms. Courtney opined that Mr. Bibbs could no longer perform the cashier/bagger/stocker position at the grocery store, because part of his past duties called for a "heavy" exertion level. [Doc. 14-2 at 64-65.] The ALJ posed two hypothetical questions to Ms. Courtney. First, the ALJ asked if there were any jobs available for Mr. Bibbs given his limited exertional capacity. [Doc. 14-2 at 65.] Ms. Courtney responded that

based on his residual functional capacity ("RFC") evaluation Mr. Bibbs could fill "light and unskilled" positions, and such positions existed in the national and regional economy. [Doc. 14-2 at 65.] Ms. Courtney cited three specific job types and the number of positions regionally and nationally:  bulk filler, 2,000 regional, 45,000 national; inspector/tester/ examiner, 2,500 regional, 55,000 national; and general assembler, 3,000 regional, 100,000 national.  [Doc. 14-2 at 65-66.] The ALJ then posed the second hypothetical question to Ms. Courtney:  whether there would be any jobs in the national economy for Mr. Bibbs if he was expected to miss work for three or more days each month due to sickle cell crises. [Doc. 14-2 at 66.]  Ms. Courtney indicated that there would be no jobs available for Mr. Bibbs under such circumstances.  [Doc. 14-2 at 66.]

## II.  <u>LEGAL STANDARDS</u>

### A.      **Standard for Proving Disability**

To qualify for disability benefits, Mr. Bibbs must be found "disabled" under the Social Security Act.  42 U.S.C. § 423(a)(1)(E).  The Act defines "disability" in pertinent part as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations, 20 C.F.R. §§ 404.1520, 416.920, prescribe a sequential five-part test to determine whether a claimant was disabled, wherein the ALJ must consider whether:  "(1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's

impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy." *Taylor v. Barnhart*, 425 F.3d 345, 351-352 (7th Cir. 2005). "A finding of disability requires an affirmative answer at either step three or step five." *Id.* at 352. Mr. Bibbs has the burden of proof for the first four steps while the Commissioner bears the burden for the fifth step. *Id.*

**B.     Standard for Judicial Review**

An ALJ's decision will be upheld so long as the ALJ applied the correct legal standard, and substantial evidence supported the decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). The ALJ has a duty to fully and fairly develop the record. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). "[T]he ALJ's reasoned judgment of how much evidence to gather should generally be respected." *Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004).

### III.   DISCUSSION

**A.  ALJ Findings**

The ALJ concluded that Mr. Bibbs was not under a disability within the meaning of the Social Security Act since the application date. [Doc. at 14-11.] The ALJ determined that

26

Mr. Bibbs had the following severe impairments:  sickle cell disease, right knee pain due to a 1992 gunshot wound, and obesity.  [Doc. 14-2 at 13.]  The ALJ also found that the medical evidence of record did not show that anxiety or depression were medically determinable impairments.  [Doc. 14-2 at 13.]

The ALJ found that Mr. Bibbs did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  [Doc. 14-2 at 14.]  The ALJ determined that Mr. Bibbs did not meet the listing of 1.03, as he has the ability to ambulate effectively.  [Doc. 14-2 at 14.]  The ALJ evaluated Mr. Bibbs's sickle cell anemia in light of the criteria found in listing 7.05. [Doc. 14-2 at 14.]   The ALJ determined that Mr. Bibbs's condition did not meet the requirements of the listing, because there were no documented pain crises at least three times during the five months before adjudication; three periods of extended hospitalization in the 12 months prior to adjudication; chronic, severe anemia with persistent hematocrit of 26 percent or less; or resulting impairment under the criteria for another, affected body system.  [Doc. 14-2 at 14.]

Next, the ALJ found that Mr. Bibbs has the residual functional capacity to perform light exertional work as defined in 20 CFR 416.967(b); however, he is "limited to occasional climbing or stairs or ramps (but never ladders, ropes or scaffolds), balancing, stooping, kneeling, crouching or crawling; and avoiding concentrated exposure to work place hazards."  [Doc. 14-2 at 14.]

Finally, the ALJ noted that while Mr. Bibbs could not return to his former position as cashier/bagger/stocker because it was in the heavy exertional range, Mr. Bibbs could fulfill a number of available jobs in the national economy.  [Doc. 14-2 at 16.]  Ultimately, the ALJ found that Mr. Bibbs was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  [Doc. 14-2 at 17.]  The ALJ, therefore, concluded that a finding of "not disabled" was appropriate.  [Doc. 14-2 at 17.]

**B.  Mr. Bibbs's Arguments**

First, Mr. Bibbs asserted that substantial evidence did not support the ALJ's step three decision that Mr. Bibbs's sickle cell anemia did not meet the requirements of Listing 7.05A.  In making that argument, Mr. Bibbs also contended that fairness and justice require reversal of the ALJ's decision, and that the ALJ should have called a medical advisor to testify whether Mr. Bibbs's combined impairments medically equaled a listed impairment.  Second, Mr. Bibbs complained that the ALJ's credibility determination was patently wrong.  Finally, Mr. Bibbs asserted that substantial evidence did not support the ALJ's step five determination that Mr. Bibbs was not disabled because he could perform some jobs.[5]

---

[5] The Court finds Mr. Bibbs's briefing in this case to be entirely inadequate, consisting of pages of bare medical record listings without any substantive analysis other than bald assertions and conclusory statements.  Courts in this District have previously found this style of argument by Mr. Bibbs's counsel to be waived due to lack of development.  See *D.O.B. ex rel. Dudley v. Astrue*, No. 1:10-cv-01142-WTL-TAB (S.D. Ind. Aug. 3, 2011); *Firkins v. Astrue*, No. 1:09-cv-00923-JMS-TAB, 2010 WL 3037257 (S.D. Ind. Aug. 3, 2010); *Williams v. Astrue*, No. 1:08-cv-1353-JMS-TAB, 2010 WL 2673867 (S.D. Ind. June 29, 2010); *Idiaghe v. Astrue*, No. 1:08-cv-1354-WTL-DML, 2010 WL 1190326 (S.D. Ind. Mar. 23, 2010); *Poston v. Astrue*, No. 1:08-cv-1543-JMS-LJM, 2010 WL 987734

### 1.      The Step-Three Determination

Below, the ALJ concluded that Mr. Bibbs did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Pt. 404, Subpt. P, App. 1.  [Doc. 14-2 at 14.]  As noted above, the ALJ determined that Mr. Bibbs's knee did not amount to a severe impairment, because he had the ability to ambulate effectively.  20 CFR Pt. 404, Subpt. P, App. 1, § 1.03.  [Doc. 14-2 at 14.]  Mr. Bibbs does not dispute that determination.  The ALJ further determined that Mr. Bibbs's sickle cell anemia was not a severe impairment, because "there are no documented pain crises at least three times during the five months before adjudication; three periods of extended hospitalization in the 12 months prior to adjudication; chronic, severe anemia with persistent hematocrit of 26% or less; or resulting impairment under the criteria for another, affected body system."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 7.05.  [Doc. 14-2 at 14.]  Mr. Bibbs only challenges the ALJ's step-three determination with respect to sickle cell anemia.  Specifically, Mr. Bibbs challenges the ALJ's step-three determination on grounds that he suffered three documented painful crises that occurred five months before the

---

(S.D. Ind. Mar. 15, 2010); *Whitlow v. Astrue*, No. 1:07-cv-1173-WTL-TAB, 2009 WL 648602 (S.D. Ind. Mar. 10, 2009).  This Court "is not obligated to research and construct legal arguments open to parties, especially when they are represented by counsel as in this case."  *John v. Barron*, 897 F.2d 1387, 1393 (7th Cir. 1990) (citations omitted). Nonetheless, even a "woefully underdeveloped" argument will not be deemed forfeited when the Court knew and understood the argument the party intended to make.  *U.S. v. Roque–Espinoza*, 338 F.3d 724, 727 (7th Cir. 2003).  Such is the case with Mr. Bibbs's argument relating to the step-three determination.

adjudication; thus, Mr. Bibbs met the requirements for listing 7.05A and should be entitled to SSI benefits.

### a.  Listing 7.05

A claimant meets listing 7.05 when he or she has a diagnosis of sickle cell disease or one of its variants with one of the following:

A. Documented painful (thrombotic) crises occurring at least three times during the 5 months prior to adjudication; or

B. Requiring extended hospitalization (beyond emergency care) at least three times during the 12 months prior to adjudication; or

C. Chronic, severe anemia with persistence of hematocrit of 26 percent or less; or

D. Evaluate the resulting impairment under the criteria for the affected body system.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 7.05.

### b.  ALJ's Step-Three Determination

With respect to the step-three determination, the ALJ provided a conclusory statement that Mr. Bibbs's sickle cell disease did not meet the requirements of listing 7.05. [Doc. 14-2 at 14.] The ALJ concluded: "It does not meet the requirements of the listing in that there are no documented pain crises at least three times during the five months before adjudication; three periods of extended hospitalization in the 12 months prior to adjudication; chronic, severe anemia with persistent hematocrit of 26% or less; or resulting impairment under the criteria for another, affected body system." [Doc. 14-2 at 14.]

30

While the ALJ provided no specific findings with respect to the step-three determination, the ALJ provided some sort of rationale for that determination in the decision's step-four analysis. The ALJ found no evidence of three extended hospital stays for sickle cell crises in the 12 months before the adjudication. [Doc. 14-2 at 15.] The ALJ stated: "A careful review of the treatment notes shows not only the lack of three extended hospital stays for a sickle cell crises in the 12 months before this adjudication, but also that there may never have been an extended hospital stay for a painful crises." [Doc. 14-2 at 15.] The ALJ further stated: "Although there are times when the claimant appears at a doctor's office or emergency room complaining of pain related to his sickle cell disease, the times he is actually admitted into the hospital for more than a day or two are when he has some other medical issue, such as pneumonia, a gastrointestinal sickness, or musculoskeletal pain." [Doc. 14-2 at 15.]

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett*, 381 F.3d at 668. The ALJ did not expressly reference the language of listing 7.05A, but seemed to conclude that there was no evidence to document Mr. Bibbs's claim that he experienced painful sickle cell crises every few weeks. [Doc. 14-2 at 15.] The ALJ noted that Mr. Bibbs frequently appeared in the emergency room in 2008, but seemed to dismiss those visits, where some of the alleged crises were characterized as mild, in other instances medical staff expressed a concern of Mr. Bibbs's use of narcotic pain medication, and on other occasions medical staff noted that Mr. Bibbs was resistant to alternative

treatments not involving narcotic pain medication.  [Doc. 14-2 at 15.]  The ALJ rejected Mr. Bibbs's testimony regarding the intensity, persistence, and limiting effects of his sickle cell disease.  [Doc. 14-2 at 15.]  The ALJ also rejected the testimony of Mr. Bibbs and his wife regarding the frequency of his sickle cell crises.  [Doc. 14-2 at 15.]  In reaching a conclusion, the ALJ also noted that there were no statements from treating physicians regarding specific limitations, and that "[t]he State evaluator concluded that there was no severe impairment whatsoever."  [Doc. 14-2 at 15.]

The ALJ's decision goes to great lengths to undermine Mr. Bibbs's claims and credibility, and strains to find a rationale to ultimately reject Mr. Bibbs's SSI claim.  On appeal, the Court finds that the ALJ should have taken care to develop Mr. Bibbs's medical record to make a suitable step-three determination.  Moreover, it appears clear that the ALJ disregarded some very key pieces of evidence without providing a justification to do so.

### c.   When Did the Adjudication Occur?

At the outset, the parties dispute the term "adjudication," which has relevance because Mr. Bibbs must establish that he had three painful crises during the five months before adjudication.  As noted above, the ALJ made no express findings with respect to listing 7.05A; and, therefore, did not identify the period constituting "the 5 months prior to adjudication."  The Social Security Regulations and case law do not define "adjudication in this context.  "[O]ne word can take multiple meanings."  *Calderon v. Witvoet*, 999 F.2d 1101, 1104 (7th Cir. 1993).  For instance, an "adjudication" is defined as "[t]he legal process of resolving a dispute" or simply as "judgment."  Black's Law Dictionary 47 (9th ed. 2009).

The Administrative Procedures Act ("APA") defines an "adjudication" as the "agency process for the formulation of an order."  5 U.S.C. § 551(7).

Mr. Bibbs assumed that "prior to adjudication" means prior to the date of the hearing, which occurred on February 26, 2010.  Mr. Bibbs also noted that the ALJ permitted Mr. Bibbs to submit additional evidence within 15 days of the hearing.  [Doc. 14-2 at 68.] Defendant argued that adjudication generally means "the formal giving or pronouncing of a judgment or decree in a court proceeding; also the judgment or decision given."  The ALJ issued the decision in this case on May 28, 2010. As such, Defendant asserted that the five month period encompasses the five months before the ALJ's ruling or decision on May 28, 2010.

The Court is disinclined to adopt Defendant's definition of "adjudication."  The Social Security Regulations specifically define "decision" as "the decision made by an administrative law judge or the Appeals Council."  20 C.F.R. § 404.901.  It seems reasonable that if this was the trigger date, the regulations would have used the term "decision" rather than "adjudication."  The Social Security Regulations, in part, describe the administrative review of disability claims as a process.  See 20 C.F.R. § 405.1(a) and (b).  This is consistent with the APA's definition of "adjudication," as noted above.  This Court finds that the date of the administrative hearing in this case would be a reasonable date for the purposes of identifying a period "5 months prior to adjudication" given that "[t]he official record of [Mr. Bibbs's] claim will contain all of the marked exhibits and a verbatim recording of all testimony offered at the hearing; it also will include any prior initial determinations or

decisions on [Mr. Bibbs's] claim." 20 C.F.R. § 405.360.  Moreover, the Social Security Act is "construed liberally in favor of beneficiaries to effect the act's remedial purpose." *Andre v. Chater*, 910 F.Supp. 1352, 1365 (S.D. Ind. 1995).

### d.   Mr. Bibbs's Impairment and Medical Records

With respect to listing 7.05A, the ALJ made no express findings.  The ALJ discounted the testimony of Mr. Bibbs and his wife regarding the frequency of Mr. Bibbs's sickle cell crises, because the crises must be documented.  Nevertheless, the medical records clearly documented what appear to be at least three painful crises during the five months before the hearing.

Mr. Bibbs was released from a period of incarceration on or around December 10, 2009.  On December 11, 2009, he reported to the emergency room, complaining of pain related to sickle cell crisis with pain in all of his joints, chest, and back.  [Doc. 14-12 at 77.] Mr. Bibbs rated his pain as eight out of ten.  [Doc. 14-12 at 77.]  The medical staff provided a clinical impression of clinical cell crisis.  [Doc. 14-12 at 78.]  Mr. Bibbs characterized his pain as eight out of ten.   [Doc. 14-12 at 77.]   Medical staff treated Mr. Bibbs with intravenous pain medications.  [Doc. 14-12 at 82.]

On December 19, 2009, he reported to the emergency room, complaining of abdominal pain and joint pain.  [Doc. 14-13 at 5.]  The medical records for this visit do not specifically mention sickle cell crisis; however, medical staff indicated "pain crisis" as the

clinical impression, and provided similar treatment with intravenous pain medications used as used on other occasions.  [Doc. 14-12 at 96; Doc. 14-13 at 4.]

On December 24, 2009, Mr. Bibbs reported to the emergency room, complaining of nausea and vomiting, as well as sickle cell crisis.  [Doc. 14-13 at 11-26.] Mr. Bibbs rated his pain as seven out of ten.  [Doc. 14-13 at 77.]  The medical staff noted vomiting and sickle cell crisis as the clinical impression.  [Doc. 14-13 at 11.]  Medical staff provided intravenous treatment, and presented sickle cell disease educational materials upon discharge.  [Doc. 14-13 at 11-26.]

On December 30, 2009, Mr. Bibbs reported to the emergency room, complaining of sickle cell crisis, as well as nausea and vomiting.  [Doc. 14-13 at 27, 37.]  Mr. Bibbs characterized his pain as eight out of ten.  [Doc. 14-13 at 30.]  Medical staff treated Mr. Bibbs with intravenous pain medications. [Doc. 14-13 at 35.]  Mr. Bibbs was subsequently hospitalized until January 4, 2010, as a result of those symptoms.  [Doc. 14-14 at 6-7.]  Upon discharge, medical staff characterized Mr. Bibbs's sickle cell crisis as acute.  [Doc. 14-13 at 27.]  The discharge notes also provided that the laboratory evidence of sickle cell crisis was limited with "no documented sickling cells at his peripheral smear but his hemoglobin did drop to 11.5 during his hospital stay.  [Doc. 14-13 at 27.] It was noted that Mr. Bibbs had a mild leukocyfosis at 13.0 and mild thrombocytopenia at 140 at one point. [Doc. 14-13 at 27.] Thrombocytopenia is "[a] condition in which there is an abnormally small number of platelets in the circulating blood."  Stedmans Medical Dictionary (27th ed. 2000).

On January 8, 2010, Mr. Bibbs reported to the emergency room, complaining of sharp chest pain, and medical staff diagnosed him with sickle cell crisis, hypertension, and questionable obstridium difficile.  [Doc. 14-13 at 58-63.]  Mr. Bibbs characterized his pain as eight out of ten.  [Doc. 14-13 at 58.]  Medical staff noted sickle cell crisis as the clinical impression.  [Doc. 14-13 at 59.]  Medical staff treated Mr. Bibbs with intravenous pain medications.  [Doc. 14-13 at 63.]  Mr. Bibbs was subsequently admitted to the hospital, upon which time the medical staff noted that "his symptoms never improved even at the time of discharge [January 4, 2010] and since that time have been worsening."  [Doc. 14-14 at 9.]  Medical staff assessed Mr. Bibbs with sickle cell crisis, nausea and vomiting, hypertension related to pain, and deep venous thrombosis prophlylaxis although Mr. Bibbs was able to ambulate.  [Doc. 14-14 at 11.]  The discharge notes provided that Mr. Bibbs's symptoms appeared to resolve within three days, but he continued to complain of severe pain.  [Doc. 14-14 at 22.]  The hematologist noted sickle cell crisis as the clinical impression during the January 15, 2010 consultation, although the hematologist did not feel that Mr. Bibbs "was in crisis at this time."  [Doc. 14-14 at 14-15, 22.]  Mr. Bibbs was discharged on January 20, 2010.  [Doc. 14-14 at 21.]  The discharge notes reflected that Mr. Bibbs's sickle cell crisis appeared to resolve within three days, although he continued to complain of severe pain.  [Doc. 14-14 at 22.]  A hematologist noted that Mr. Bibbs did not appear to be in crisis when he examined Mr. Bibbs.  [Doc. 14-14 at 22.]  The hematologist also expressed a concern that due to Mr. Bibbs's many years of being on narcotics, he may have developed dependence as well as a high tolerance for such treatment.  [Doc. 14-14 at 22.]

36

### e.   ALJ's Inadequate Discussion

In this case, Mr. Bibbs reported to the emergency room on at least three occasions, complaining of sickle cell crises.  The ALJ provides no explanation why these sickle cell crises did not satisfy listing 7.05A.  The ALJ performed no inquiry into the five incidents, four of which specified sickle cell crisis, that occurred in December 2009 and January 2010.  Remand is warranted, where an ALJ's determination lacks adequate discussion of the issues.  *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).  The key question is whether Mr. Bibbs suffered at least three documented painful (thrombotic) crises during the five months before the adjudication to satisfy listing 7.05A.  The medical records documented that Mr. Bibbs suffered from at least four painful crises; however, they do not characterize the crises as "thrombotic."  Thrombosis is the "[f]ormation or presence of a thrombus; clotting within a blood vessel which may cause infarction of tissues supplied by the vessel."  Stedmans Medical Dictionary (27th ed. 2000).  The January 4, 2010 discharge notes reference thrombocytopenia.  Moreover, vaso-occlusive manifestations or the blockage of blood vessels are among the principal events in sickle cell disease.  5-S, J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine, (Matthew Bender), at S-147.  For the most part, the ALJ completely ignored the December 2009 and January 2010 emergency room visits and hospitalizations.  Ultimately, the ALJ failed to develop the record to make an appropriate determination whether Mr. Bibbs satisfied listing 7.05A.  See *Binion*, 13 F.3d at 245.  Notably, the ALJ offered no explanation for the failure to fully discuss and analyze the five emergency room visits, two of which led to hospitalization, with respect to this particular

37

listing.  The ALJ failed in her duty to fully explore this matter.  See *Barnett*, 381 F.3d at 669.

Moreover, the ALJ ignored critical pieces of evidence in this case, namely, the December

2009 and January 2010 emergency room visits and hospitalizations.  See *Myles*, 583 F.3d at

676.

Additionally, Mr. Bibbs visited the emergency room on 18 occasions between March

21, 2008, through June 12, 2008.  These dates are noteworthy, along with the emergency

room visits and hospitalizations in December 2009 and January 2010, because they occurred

after the SSA physicians examined Mr. Bibbs (on January 7, 2008, and March 17, 2008), and

the ALJ cited the "State evaluator's" conclusion of no severe impairment as one of the bases

to deny Mr. Bibbs's claim.  The record shows that Mr. Bibbs reported to the emergency

room once before the initial Social Security evaluation on January 7, 2008.  Mr. Bibbs

reported to the emergency room six times between January 16, 2008, through March 7, 2008

(the second Social Security evaluation took place on March 17, 2008).  If Mr. Bibbs

experienced painful crises during the post-March 17, 2008 emergency room visits, they

constitute additional medical evidence that may have significantly affected SSA physicians'

opinions as to whether Mr. Bibbs met or equaled listing 7.05.  See *J.H. v. Astrue*, 368 Fed.

Appx. 674, 679 (7th Cir. 2010) (the Social Security Regulations call for the ALJ to secure

another expert opinion if new evidence might cause the initial opinion to change).  In this

regard, the ALJ failed to develop the record to explain the gaps in Mr. Bibbs's medical

treatment history.  See *Barnett*, 381 F.3d at 669.

Further, Mr. Bibbs's medical records contain some gaps with respect to documented sickle cell crises resulting in emergency room visits or hospitalizations.  There were three documented emergency room visits or hospitalizations before Mr. Bibbs filed for SSI benefits on December 14, 2007 (in February 2006, as well as on March 21, 2007, and September 9, 2007).   Next, there were 25 documented emergency room visits or hospitalizations between January 16, 2008, through June 12, 2008.  Following a July 1, 2008 office visit, there are no medical records until Mr. Bibbs's incarceration in February 2009.  The DOC medical records contain a few references by Mr. Bibbs regarding his sickle cell disease.  On May 27, 2009, Mr. Bibbs reported that his last sickle cell crisis was in February 2009.  It was also noted that Mr. Bibbs complained of sickle cell crisis on June 1, 2009; that Mr. Bibbs stated his sickle cell was "causing problems" on July 30, 2009; and that Mr. Bibbs reported that his sickle cell was "acting up" on August 20, 2009.  It is also undisputed that Mr. Bibbs was removed from his kitchen job in August or September 2009 due to his sickle cell disease.  [Doc. 14-2 at 44-45.]  In the hearing, the ALJ did not pose any questions to Mr. Bibbs regarding the period from July 1, 2008, through February 2009, where there were no medical records.  Further, the ALJ did not pose any questions regarding why Mr. Bibbs had relatively few sickle cell crises, if any, during his period of incarceration.

### f.     ALJ Selectively Chose Facts to Support Denial

In this voluminous record, it seems that Mr. Bibbs may have satisfied listing 7.05A; however, a question remains whether his painful crises were thrombotic.  The ALJ cites some specific medical records to contradict Mr. Bibbs's claims of frequent sickle cell crises.

First, the ALJ cites three medical records, indicating that the crises were characterized as "mild," if occurring at all.[6]  Those specific medical records support that finding.  On September 9, 2007, Mr. Bibbs was characterized as having a "mild sickle cell crisis" after being admitted to the hospital for observation for 23 hours.  [Doc. 14-9 at 58.]  Another medical record cited by the ALJ was a July 1, 2008 office visit to follow-up after emergency room visits; however, at that office visit, Mr. Bibbs complained only of a residual effect related to his ear.  [Doc. 14-14 at 5.]  Presumably, the ALJ used this out of context medical record as evidence that no sickle cell crisis occurred at a given office visit.  The ALJ apparently sought to use the foregoing two examples to cast doubt on Mr. Bibbs's many "appearances" in the emergency room in 2008 (18 emergency room visits between March 21, 2008 through June 12, 2008).  On January 5, 2010, the hematologist, after an office visit, reported that Mr. Bibbs was in "mild distress."  [Doc. 14-14 at 18.]  Recall that Mr. Bibbs was admitted to the hospital on December 30, 2009, and released on January 4, 2010.  [Doc. 14-14 at 6-7.]  Mr. Bibbs later reported that his sickle cell pain had not abated following discharge from the hospital when he returned to the emergency room on January 8, 2010.  [Doc. 14-13 at 58-63.]  The ALJ does not reference the subsequent 29 emergency room visits, of which 24 involved some sort of sickle cell crisis, and of those 24, five resulted in hospitalizations.  Moreover, listing 7.05A calls for a painful crisis—there is no qualifier

---

[6] The ALJ apparently ignored Mr. Bibbs's testimony that a mild sickle cell crisis would cause him to miss three or four days of week. [Doc 14-2 at 36, 49.]

calling for severe pain rather than mild pain.  However, the painful crisis must be thrombotic, and the ALJ made no inquiry in that regard.

Next, the ALJ noted that doctors expressed concerns with Mr. Bibbs's use of narcotic pain medication.  One of the records supported such a concern.  In Mr. Bibbs's January 20, 2010 discharge from the hospital, it was noted that Mr. Bibbs requested an increase of pain treatment even though his sickle cell crisis apparently resolved.  [Doc. 14-14 at 22.]  It was also noted that the hematologist felt that Mr. Bibbs may have developed dependence to and high tolerance for the narcotic medications used to treat his sickle cell disease.  [Doc. 14-14 at 22.]  The other record, cited by the ALJ, does not support such a concern.  After a May 29, 2007 office visit, it was noted that the physician and Mr. Bibbs discussed options related to a consultation with a hematologist.  [Doc. 14-9 at 30.]  At that time, Mr. Bibbs believed that his sickle cell disease was under control by using pain medications, and the physician noted "what appears to be responsibly not yet requiring refill of his Vicodin [sic]."  [Doc. 14-9 at 30.]  Based on those records, the ALJ opined that Mr. Bibbs's use of narcotic pain medication "could be the actual cause for the complaints."  [Doc. 14-2 at 15.]  The ALJ's reliance of the second record certainly calls that opinion into question.  The ALJ seems to disregard the notion that the sickle cell crises are indeed extremely painful episodes for Mr. Bibbs.

Additionally, the ALJ cited one medical record, wherein Mr. Bibbs's sickle cell disease was described as variant, which usually led to a more benign course.  The ALJ

extracted that excerpt from a hematologist report related to Mr. Bibbs's 12-day hospitalization.  The entire note reads:

> The patient is with a variant sickle cell syndrome with hemoglobin SC disease.  This usually portends a more benign course.  Right now he has been re-admitted with painful episode, as well as clostridium difficile collitis, which was detected in 1/08.  His diarrhea has improved.  His counts seem to be getting better.  His hemoglobin has stayed stable, and today it is 10.7.  His total bilirubin is 1.3.  We will check reticulocyte count and LDH q.a.m.  He will need to continue IV hydration and symptomatic management.  I would suggest to continue trying to wean from IV Dilaudid to p.o. Diaudid to be able to discharge home.  At this time, the patient is on 1500 mg of Hydrea, which he is supposed to be taking as an outpatient, however his MCV is only 95, which is barely above the upper limit of normal, which would suggest that he has been noncompliant with outpatient therapy.  At this time, I will continue this in hope of increasing fetal hemoglobin.

[Doc. 14-14 at 9.] The ALJ conveniently overlooks the observation that Mr. Bibbs was "re-admitted with painful episode [sic]."

The ALJ further cited one medical record, wherein Mr. Bibbs stated that his sickle cell disease was "under control"; Mr. Bibbs's statement was made at a May 29, 2007 office visit.  [Doc. 14-9 at 30.]  Obviously, that statement occurred before Mr. Bibbs filed for SSI benefits and his numerous emergency room visits and hospitalizations during the first half of 2008.

Finally, the ALJ wrote: "And in spite of limited access to treatment while incarcerated in 2009 (Exhibit 7F), the claimant noted that a period of treatment in early 2010 caused him to feel better than ever (Exhibit 8F/243)." [Doc. 14-2 at 15.]  The ALJ took Mr. Bibbs's statement entirely out of context.  Mr. Bibbs made that statement at the emergency room on January 8, 2010, where he complained of sickle cell crisis, among other things.

42

[Doc. 14-13 at 60-61.]  Mr. Bibbs reported at that time that he had just been hospitalized for five days and discharged, but he "has never felt better" and he remained in pain in all joints, lower back, and chest, as well as experiencing nausea, vomiting, and diarrhea.  [Doc. 14-13 at 60.]

The ALJ used the foregoing pieces of evidence to craft, in part, the decision's step-four conclusion:

> The claimant's allegations and testimony are insufficient to support his level of complaints and his history that he experiences frequent pain crises requiring treatment.  He testified he stopped working at his uncle's restaurant in 2007 due to pain, but the medical records indicate it was because the restaurant closed (Exhibit 9F/13).  The only treatment he consistently accepts is narcotic pain medication.  He reports pain crises, but the doctors conclude otherwise.  The reasonable conclusion is that although the nature of the symptoms is consistent with the diagnosis, their level as described by the claimant is not credible.  In short, the evidence does not support functional limitations beyond the residual functional capacity, much less a disease process which meets listing level severity.
>
> As for the opinion evidence, there are no statements from treating doctors regarding specific limitations.  The State evaluator concluded that there was no severe impairment whatsoever (Exhibit 2F).  That is somewhat contrary to the medical evidence, so the undersigned finds that the confirmation of sickle cell disease, with the expectation of at least some resulting symptoms, supports the residual functional capacity as outlined.

[Doc. 14-2 at 15-16.]

### g.    Step-Three Determination Must Be Based on the Entire Record

The ALJ supported the  step-three decision with questionable fact finding, and outdated opinions by SSA physicians.  The ALJ's decisions appears to be an exercise in cherry picking favorable facts to deny benefits.  "It is not enough for the ALJ to address mere portions of a doctor's report."  *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).  As

noted above, SSA physicians have not evaluated Mr. Bibbs since March 17, 2008, before numerous emergency room visits and hospitalizations of Mr. Bibbs, and almost two years before the administrative hearing in this case.  With respect to painful crises, the ALJ summarily rejected Mr. Bibbs's reports of sickle cell crises, where "the doctors conclude[d] otherwise."  [Doc. 14-2 at 15.]  The ALJ provides no citation to the record to support that statement.  The ALJ also rejected the testimony of Mr. Bibbs and his wife, which indicated that the sickle cell crises were completely debilitating.  [Doc. 14-2 at 28, 50, 53, 56.]  In evaluating evidence of Mr. Bibbs's pain or other subjective complaints, the ALJ may not ignore Mr. Bibbs's subjective testimony even if it was uncorroborated by objective medical evidence.  *Higgins v. Apfel*, 136 F.Supp.2d 971, 977 (E.D. Mo. 2001).  The ALJ cited no objective medical evidence to support the conclusion that the various physicians discounted Mr. Bibbs's reports of pain.  Importantly, there was no indication that SSA physicians reviewed Mr. Bibbs's complete medical file (given that a large portion of the records followed those examinations), and there were no opinions from Mr. Bibbs's treating physicians regarding his sickle cell disease.  This case warranted a medical expert.

The Court cannot decide whether the ALJ's step-three determination was the rational result of a full consideration of all of the relevant medical evidence; thus, there is no basis to uphold the determination.  *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).  There was a significant amount of evidence that could favor a finding that Mr. Bibbs met or medically equaled listing 7.05A; however, the ALJ failed to make an appropriate inquiry with respect to listing 7.05A, failed to indicate that all of the evidence was considered, and

44

offered no explanation as to why some evidence was not considered or rejected.  As such, the Court cannot conclude that the ALJ's decision was substantially supported.  *Clifford*, 227 F.3d at 872.  Moreover, the ALJ should have called for a new evaluation of Mr. Bibbs in light of the numerous emergency room visits and hospitalizations of Mr. Bibbs following the initial Social Security evaluations.  See *Flener*, 361 F.3d at 448.

### 2.    The Credibility Determination

Mr. Bibbs also takes issue with the ALJ's credibility determination regarding Mr. Bibbs's testimony.  "In evaluating the credibility of statements supporting a Social Security application . . . an ALJ must comply with the requirements of Social Security Ruling 96-7p."  *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).  The ALJ should consider the following factors in making a credibility determination:  (1) the objective medical evidence; (2) daily living activities; (3) the location, duration, frequency, and intensity of pain and other symptoms; (4) precipitating and aggravating factors; (5) medications taken; (6) treatment; (7) other measures taken to relieve symptoms; (8) any other factors concerning Mr. Bibbs's functional limitations and restrictions.  See SSR 96-7p.  The ALJ was in the best position to determine the credibility of Mr. Bibbs, *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), and the credibility determination will be disturbed only if it was unreasonable or unsupported.  *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ's decision reflected that the factors above were considered in making a credibility determination.  [Doc. 14-2 at 14-15.]  The ALJ provided what appears to be a boilerplate finding that Mr. Bibbs's "statements concerning the intensity, persistence and

45

limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [Doc. 14-2 at 14-15.] The RFC was not included in the record, so the Court cannot evaluate the ALJ's finding in this regard. Given the discussion in the previous section, the ALJ's credibility determination is suspect, where the ALJ used out of context excerpts to support the decision to deny Mr. Bibbs's claims. In these circumstances, the ALJ's credibility determination appears to be unreasonable or unsupported. *Id.*

### 3.   The Step-Five Determination

Finally, the Court will address Mr. Bibbs's claim that substantial evidence did not support the ALJ's step-five determination that Mr. Bibbs was not disabled because he could perform some sedentary level jobs.  With respect to step five, 42 U.S.C. § 423(d)(2)(A) provided:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

Because the Court finds that remand is warranted for the step-three determination, the Court will not entertain Mr. Bibbs's inadequately briefed argument regarding the appropriateness of the ALJ's step-five determination.  Mr. Bibbs's argument consists of a scant two paragraphs without any analysis.  Further, the RFC evaluation was not included in the record.  On remand, the ALJ should, nevertheless, fully reevaluate step five in the event that the ALJ finds that Mr. Bibbs is not disabled at step three.  In this regard, the Court advises the ALJ to consider, among other things, the vocational expert's testimony that there would be no jobs in the national economy available for Mr. Bibbs if he missed three or more days a month [Doc. 14-2 at 66.], and that Mr. Bibbs was hospitalized for more than 15 days in January 2010.

## IV. CONCLUSION

For the reasons stated above, the Court **REVERSES** the ALJ's step-three determination, and **REMANDS** this case for proceedings consistent with this **ENTRY**.

Dated:  03/30/2012

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

47

Distributed to:

Thomas E. Kieper
tom.kieper@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com